IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )  Criminal No. 1:08-cr-186 (CMH) |
| | ) |
| JACOB SCOTT STAHLER, | ) |
| | ) |
| Defendant. | ) |

FILED IN OPEN COURT
MAY 19 2008
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## STATEMENT OF FACTS

Were the United States to proceed to trial in this case, it would provide testimonial and documentary evidence to prove beyond a reasonable doubt that, from approximately January 2001 through at least April 2004, defendant JACOB SCOTT STAHLER (the "Defendant"), also known as "LUNA" or "LUNATIK," did conspire and agree, in the Eastern District of Virginia and elsewhere, to violate the laws of the United States, in violation of Title 18, United States Code, Section 371, specifically to violate the federal criminal copyright laws, Title 18, United States Code, Section 2319(b)(1) and Title 17, United States Code, Section 506(a)(1). Specifically, the Defendant conspired and agreed to willfully infringe more than 10 copies of one or more copyrighted works with a total retail value of more than $2,500 in a 180 day period, for purposes of private financial gain, with others, including but not limited to Mark Shumaker, also known by his screen nickname "MARKALSO." Specifically, the testimonial and documentary evidence would establish, at a minimum, the following facts:

1.  Beginning in approximately January 2001 and continuing until at least April 2004, the Defendant was a member of an Internet music release group known as "Apocalypse Production

Crew" ("aPC"). Apocalypse Production Crew was a "warez" organization[1] that specialized in the unauthorized distribution of copyrighted music over the Internet. Among other things, aPC sought to acquire digital copies of songs and albums before their commercial release in the United States; these songs or albums were then distributed by aPC members, in MP3 format, to Internet sites worldwide. The supply of such pre-release music was often provided by music industry insiders, such as radio DJs, employees of music magazine publishers, or workers at compact disc manufacturing plants, who frequently receive advance copies of songs prior to their commercial release.

2. The business of aPC was discussed in a highly security-conscious environment; discussions were conducted in closed, invite-only Internet Relay Chat ("IRC") channels, and members used a number of security measures to protect their real identities. In fact, members of aPC rarely, if ever, used their real names in group communications. The Defendant did, however, know the name and full identity of APC member "DIGI" (a/k/a "DIGITAL", "ARKIVER"), since he was the person who introduced the Defendant to the group and for a time was the roommate of the Defendant. Many of the other aPC members with which the Defendant conspired were often known to the Defendant only by their screen nicknames.[2] Despite the lack of personal information about

---

[1] "Warez" or "pirated software" are terms used to describe digital copies/reproductions of copyright-protected computer software, games, movies, and music that are distributed and traded over the Internet in violation of copyright law. The "warez scene" refers to the complex web of both informal and formal Internet communication, distribution, and trading channels used by individuals who engage in this form of software piracy.

[2] For example, the screen name "MARKALSO" was used by Mark Shumaker, who was prosecuted and convicted in this jurisdiction for his involvement with aPC.

many of the individuals with which he was conspiring, the Defendant did reach an agreement or come to an understanding with them to violate the federal copyright laws.

3. Using the screen nicknames "LUNA" or "LUNATIK", the Defendant was an active participant in aPC. The Defendant acknowledges that he voluntarily and intentionally joined the aPC conspiracy. The Defendant was aware of the unlawful purpose of aPC and continued his involvement even after he was aware of past federal prosecutions against similar groups.

4. The Defendant acted as a ripper for aPC. As a "ripper," the Defendant reproduced copyrighted works on behalf of aPC by converting or "ripping" music files into a computer format that was easily transferrable from computer to computer. During this process, the Defendant uploaded more than 10 digital copies of commercially released copyrighted works. The Defendant did these uploads to receive sufficient credit to remain an active member of aPC and, as a result of this membership, received access to a vast quantity of infringed copyrighted works.

5. The Defendant admits that his actions included uploading of infringing items, within the meaning of §2B5.3(b)(2) of the applicable Federal Sentencing Guidelines.

6. The Defendant downloaded over the Internet more than 10 copies of digital copyrighted works during his involvement with aPC. These works included application and utility software titles, movies, music files, and videogames. These downloads were not authorized by the owners of the copyrighted works and were clearly marked as being products of the "warez scene."[3]

---

[3] Infringed copyright products within the warez scene are generally marked by the group responsible for their initial reproduction and distribution. For example, copyrighted works released by the group APC would have the suffix "APC" in the title of the released work. Additionally, most groups in the warez scene also prepare a "NFO" file, which is a separate file included in a download of a copyrighted work that takes credit on behalf of the specific warez group for the reproduction and distribution of the work.

3

Although the Defendant did not engage in the commercial sale of copyrighted works, he did receive "personal financial gain" within the meaning of the criminal copyright statute, see 17 U.S.C. §§ 101 & 506(a)(1) and the Federal Sentencing Guidelines § 2B5.3, Application note 1, in that he received, and expected to receive, access to other copyrighted works at no cost.

7. As part of the aPC conspiracy, copyrighted works were transferred to the group from a computer server in the Eastern District of Virginia between March and October 2001. [4] Mark Shumaker, also known as MARKALSO, the leader of aPC for some part of the Defendant's involvement in the group, used his access to the Fatal Error computer server to reward members of aPC with infringing copyrighted works for their involvement in aPC.

8. Defendant acknowledges that, through the aforementioned acts and others, he did willfully enter into an agreement with one or more individuals for the express purpose of unlawfully reproducing and distributing copyrighted materials via the Internet. The Defendant also acknowledges that he did so knowing of the unlawful nature of the activity, and through the aforementioned acts and others, acted in furtherance of such agreement in an effort to carry out or accomplish the object of the conspiracy. Defendant also acknowledges that, through the acts of himself and others in the conspiracy, aPC caused the reproduction and distribution over the Internet of more than 10 copies of copyrighted works within a 180-day period having a total retail value of more than $2,500.

9. On or about June 24, 2004, FBI agents executed a search and seizure warrant at the Defendant's now former residence in West Des Moines, Iowa. At that time, agents seized

---

[4] The "Fatal Error" computer server was installed at the computer facilities of an Internet Service Provider located in Dulles, Virginia between on or about March 3, 2001 until on or about October 25, 2001.

computers, a large collection of audio and video discs, and related equipment. Forensic analysis of the seized hard-drive indicates that the equipment was used to reproduce more than 10 copyrighted works.

10. The Defendant admits that aPC caused more than $30,000 but less than $70,000 in infringement of copyrighted works during his voluntary and active involvement with the conspiracy.

11. The Defendant and government agree to recommend to the Court, based on the evidence now known to the government, that the infringement amount under the provisions of §2B5.3(b)(1) of the applicable Federal Sentencing Guidelines attributable to the Defendant should be more than $30,000 but less than $70,000.

Respectfully submitted,

Chuck Rosenberg
United States Attorney

By: _____
Jay V. Prabhu
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, JACOB SCOTT STAHLER, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
JACOB SCOTT STAHLER
Defendant

I am JACOB SCOTT STAHLER's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
William O. Douglas Loeffler, Esq.
Counsel for Defendant JACOB SCOTT STAHLER

Date: 5-19-08